MAGILL (BANK OF UNITED STATES v.). See Case No. 929.

MAGILL (UNITED STATES v.). See Case No. 15,706.

## Case No. 8,953.

### The MAGNA CHARTA.

[2 Lowell, 136.][1]

District Court, D. Massachusetts. June, 1872.

SEAMEN'S WAGES — LAW OF THE FLAG — LEFT IN FOREIGN PORT — RATE OF WAGES.

1. The rights of seamen in respect to wages depend on the law of the flag, without regard to the nationality of the seamen themselves.

2. It appears to be the law of Great Britain, that when a seaman is hurt in the service of the ship, and left behind for that cause in a foreign port, and the cause is duly certified by the consul, the ship is responsible for his care and subsistence, but the wages stop.

[Cited in The W. L. White, 25 Fed. 505.]

3. Where such a seaman was so left behind, and the ship afterwards, on the same voyage, came back to the port and took the seaman on board again, and he served to the port of final discharge, and no new contract in writing was made with him, *held*, the presumption was that he was to have the rate of wages originally agreed on, though the market rate was lower at the foreign port.

4. But it would not be presumed that the seaman was to have wages for the whole voyage, including the time he was away from the ship.

5. So far as the wages only are concerned, it seems to be immaterial by the British law whether a seaman necessarily left behind at a foreign port for injuries received on board, was hurt in the service of the ship, or by his own fault. In either case the wages stop.

The libellant was shipped at New York for a voyage thence to Cette, in France, thence to Russia, and back to a port of discharge

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

in the United States or British provinces, term not to exceed twelve months, at twenty-five dollars a month and received a month's advance. The vessel was registered as British, and the legal title was in a person living in Halifax, Nova Scotia, and the form of the articles was such as is required for such vessels. The voyage began 29th March, 1871; the vessel reached Cette in about thirty-five days, and lay there until 26th June, 1871. On the last-mentioned day, while the bark was still in port, the libellant fell from the cross-trees of the mizzen-mast while performing ship's duty, and was seriously hurt. He was sent to the hospital, where he remained for about seven months, and was wholly cured. The bark returned to Cette in January, 1872, and the libellant was taken on board again by the master, and served until the voyage ended at Boston, 28th May, 1872. The master tendered $71.50 in full for wages due the libellant, which he refused. Two certificates of the British consul at Cette were indorsed on the shipping articles: one, dated 26th June, 1871, that the seaman was left behind for sickness, not being able to go with the ship, and that the master had deposited certain sums for his wages and for hospital expenses; the second, under date 29th January, 1872, recited that the master refused to pay the remainder of the expenses, which was considerable. The answer of the master alleged that the seaman was drunk and unfit for duty, and was forbidden to go aloft, but insisted, and was injured by his own negligence; and that the reshipment at Cette was for fifteen dollars a month, a less rate of wages than the original hiring. There was conflicting evidence on both these points. Whether the ship was equitably owned by American citizens was likewise disputed.

C. G. Thomas, for libellant, contended that the libellant was to have full wages for the whole time of the voyage.

J. Nickerson, for claimant.

LOWELL, District Judge. If American citizens transfer the legal title of their ship to a subject of Great Britain, and she is sailed under a British register, and the shipping articles conform to the change, I know of no law that authorizes me to apply our statutes to such a contract. The law of the flag must control in all such matters. In this case, indeed, there is no sufficient evidence that either the libellant or any owner of the vessel is one of our citizens; and the contract is clearly and wholly British. I must apply, therefore, as well as I may, the foreign law, which governs the rights of these parties. See The Pawashick [Case No. 10,851].

It seems to me that the merchant shipping act of 1854 [Pub. Gen. St. (17 & 18 Vict.) 663], §§ 185, 207, 209, have materially changed the maritime rule that seamen are not only to be cured at the expense of the ship, but to be paid wages until the end of the voyage. The first of these sections enacts that where the service of any seaman terminates before the period contemplated in the agreement, "by reason of his being left on shore at any place abroad, under a certificate of his unfitness or inability to proceed on the voyage, granted as hereinafter mentioned, such seaman shall be entitled to wages for the time of service prior to such termination as aforesaid, but not for any further period." What the certificate is appears by section 207, which makes it a misdemeanor for any master to leave behind any seaman, without obtaining the certificate of a consular officer, in writing, indorsed on the agreement, stating the fact, and the cause thereof; section 228 makes the owners responsible for the expenses and subsistence of a seaman, who receives any hurt or injury in the service of the ship, but does not say any thing about continuing his wages if he is obliged to leave the ship; and section 229 speaks of expenses in respect of the illness, injury, or hurt of any seaman whose wages are not accounted for to the consular officer, as before provided.

As I understand this law, the ship is liable for the expenses and subsistence of seamen who are hurt, but not for their wages, if they are left behind. All the parties to this controversy and the consul appear to have understood the law in this way. The master left with the consul the wages and a certain sum for expenses, and the consul certified to the fact and cause of the leaving behind. When the bark came back to Cette, the libellant did not demand, as of right, to be brought back, but asked the master whether he had filled his place. There appears to have been a dispute at this time between the master and the consul; for we find the latter certifying on the articles that the master refused to pay the full expenses of recovery and subsistence, though the man was injured in the service of the ship; and there is still a third certificate, not indorsed on the agreement, in which he says the master has paid one hundred and seventy-five francs for these expenses, though he had in fact paid only sixty-nine francs. The remainder must have been appropriated, by the master's consent, out of the money which he originally left for the wages of the seaman, and I understood the master to testify that the money was so obtained by the consul, though I do not know that he said it was done with his consent; but as he produces the certificate, and seems to have kept it for a voucher, his assent may be inferred. Here, then, we find evidence of a compromise, by which the master undertakes to bring home the man, and to have the whole sum left with the consul applied to the hospital expenses, which, after all, were only half satisfied. That this was the real purpose is evident; because the master, on his arrival here, tendered much more than was due for the home voyage, on his own

theory of the contract, and says he did this to make up the loss of the wages which he says the consul had improperly retained.

Counsel have furnished me with no evidence of the construction of the merchant shipping act, and I have not succeeded in finding any adjudged cases; but the text-writers understand the law to be, that if the seaman is unable to proceed, and due certificate is made, the wages stop. This being so, it is not material to this case to inquire whether any fault of the libellant contributed to the injury, because that question only affects the liability for expenses and subsistence; and it is neither pleaded nor proved in this case that the master desires to recoup from the wages the sums spent for these expenses, but he himself voluntarily undertook to pay them. So far as mere wages are concerned, it is admitted by the pleadings, and by the conduct of the master throughout, that the libellant is entitled to his wages for the time he actually served; and the only dispute is, whether he is to have fifteen dollars or twenty-five dollars for the home voyage from Cette to Boston. In the uncertainty which arises from the direct contradiction between the only two witnesses who know any thing about the contract, the seaman must prevail, because section 160 of the statute requires the master to make his contract in writing before the consul, and declares that if he does not do so, the burden of proving the agreement shall be upon him; and the only prominent and clear fact being that he took the man on board again, and the consul so certifying in the paper produced by the master, I infer that he took him upon the old terms, which would be a reasonable and just contract under the circumstances, even although wages were a little lower at Cette than at New York. Indeed, I do not know that it would not be a presumption of law, in the absence of any new contract, that the old one was either revived or treated as having been only suspended.

Wages to be made up at $25 a month, deducting the time of libellant's absence from the vessel, and deducting all sums heretofore paid him. If this exceeds the sum tendered, he will have costs.